Approved: _____
Eli J. Mark/Daniel C. Richenthal
Assistant United States Attorneys

Before:   THE HONORABLE JAMES L. COTT
          United States Magistrate Judge
          Southern District of New York

**18 MAG 3876**

------------------------------------x

UNITED STATES OF AMERICA            :   **SEALED COMPLAINT**

          - v. -                    :   Violations of
                                        18 U.S.C. §§ 657, 1028A,
KAM WONG,                           :   1343, and 1344

                    Defendant.      :   COUNTY OF OFFENSE:
                                        NEW YORK
------------------------------------x

SOUTHERN DISTRICT OF NEW YORK, ss.:

   LAVALE JACKSON, being duly sworn, deposes and says that he is a Special Agent with the United States Attorney's Office for the Southern District of New York ("USAO-SDNY"), and charges as follows:

## COUNT ONE
### (Embezzlement from a Credit Union)

   1.   From at least in or about 2013, up to and including at least in or about January 2018, in the Southern District of New York and elsewhere, KAM WONG, the defendant, an officer, agent and employee of an institution, the accounts of which are insured by the National Credit Union Administration Board ("NCUA"), embezzled, abstracted, purloined and willfully misapplied money, funds, credits, securities, and other things of value belonging to such institution, to wit, WONG, the chief executive officer and president of an NCUA-insured credit union (the "Credit Union") embezzled and willfully misapplied money from the Credit Union by providing false and fraudulent information in connection with sham dental care reimbursements ostensibly owed to him, with the intent to injure and defraud the Credit Union.

   (Title 18, United States Code, Section 657.)

## COUNT TWO
### (Defrauding a Financial Institution)

2. From at least in or about 2013, up to and including at least in or about January 2018, in the Southern District of New York and elsewhere, KAM WONG, the defendant, knowingly executed a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, WONG perpetrated a fraudulent scheme to obtain, by means of false pretenses and representations, money from the Credit Union in connection with sham dental care reimbursement requests.

(Title 18, United States Code, Section 1344.)

## COUNT THREE
### (Wire Fraud)

3. From at least in or about 2013, up to and including at least in or about January 2018, in the Southern District of New York and elsewhere, KAM WONG, the defendant, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, WONG, including by the use of interstate emails, perpetrated a fraudulent scheme to obtain, by means of false pretenses and representations, money from the Credit Union in connection with dental care reimbursement requests.

(Title 18, United States Code, Section 1343.)

## COUNT FOUR
### (Aggravated Identity Theft)

4. From at least in or about 2013, up to and including at least in or about January 2018, in the Southern District of New York and elsewhere, KAM WONG, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, WONG possessed,

used, and transferred the name of a dentist in connection with sham dental care reimbursement requests, as charged in Counts Two and Three of this Complaint.

(Title 18, United States Code, Section 1028A.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.  I am a Special Agent with the USAO-SDNY, and have been in that position for approximately four years. For over the past year, I have been personally involved in the investigation of this matter, along with other Special Agents of the USAO-SDNY. Previously, I was a Special Agent with the U.S. Department of Labor-Office of Inspector General ("DOL-OIG") for over nine years. While with the USAO-SDNY and DOL-OIG, I have participated in multiple investigations of fraud and corruption offenses, including involving non-profit institutions.

6.  I am familiar with the facts and circumstances set forth below from my participation in the investigation of this matter, from my personal knowledge, from my conversations with other law enforcement agents and personnel, and witnesses, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. In addition, this investigation is ongoing, and the monetary calculations are based on the records obtained to date and are approximates, unless otherwise noted. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

7.  As described in greater detail below, an ongoing investigation has revealed, to date, that KAM WONG, the defendant, Chief Executive Officer ("CEO") and President of the Credit Union, has engaged in a long-running multi-faceted scheme to obtain money from the Credit Union to which he was not entitled, and has taken steps to seek to conceal what he has done. Among other things, WONG has defrauded and embezzled from the Credit Union by submitting invoices for dental work never performed on him or paid by him, and, as a result, obtained reimbursement for hundreds of thousands of dollars of such nonexistent dental work, as well as for his alleged personal tax liability for these and other payments or benefits. In addition

to committing fraud in connection with dental reimbursements, as set forth below, the ongoing investigation has revealed that WONG has obtained numerous other payments from the Credit Union under suspicious or questionable circumstances. WONG's scheme has harmed the non-profit Credit Union and its members, by stealing earnings that are intended to go back to its members in the form of more favorable rates and fewer and lower fees for products and services.

## Relevant Parties

8.   I have learned the following based on my interviews of current and former employees of the Credit Union, my review of records obtained from the Credit Union, and my review of publicly-available information:

### KAM WONG

a.   KAM WONG, the defendant, is the CEO of the Credit Union, and has been since 2007. He has also held the title of President of the Credit Union since 2006. WONG has been employed by the Credit Union since 1981, and previously served as its Chief Financial Officer.

b.   Since becoming CEO, WONG has been the highest paid employee of the Credit Union. His annual salary as of January 1, 2018 was $684,137. WONG's employment with the Credit Union is governed by a written employment contract (the "Contract") entered into between himself and the Credit Union's Board of Directors. The Contract provides for a salary, a bonus (to be determined annually by the Board of Directors), and several benefits, including various forms of insurance and a leased automobile. Pursuant to the Contract, WONG caused the Credit Union to lease multiple high-end luxury vehicles for him, including a late model Mercedes Benz, a Maserati Gran Turismo, and, most recently, a 2018 Ferrari California T.

c.   On or about February 22, 2018, WONG was placed on paid administrative leave by the Credit Union's Board of Directors upon the recommendation of a Special Committee overseeing an internal investigation prompted by this criminal investigation.

### The Credit Union

d.   Credit unions are not-for-profit financial institutions that are cooperatively owned by their customers, who are known as "members." As the Credit Union explains on its

publicly accessible website, credit unions, in contrast to banks, "focus on serving members, rather than on maximizing profit." As a result, a credit union's "[e]arnings [are intended to] go back to members in the form of more favorable rates and fewer and lower fees for products and services."

       e. The Credit Union, with headquarters in downtown Manhattan where WONG had an office and worked, is the oldest credit union in New York State and one of the oldest and largest in the country. The Credit Union provides banking services to its more than 425,000 members. Membership is available to employees of New York City and its agencies, employees of the federal and New York state governments who work in New York City, employees of hospitals, nursing homes and similar facilities located within New York State, and others who are eligible as specified in the Credit Union's bylaws.

       f. The Credit Union is overseen by a Board of Directors and a Supervisory Committee, which are both composed of volunteer, uncompensated members of the Credit Union.

       g. The Credit Union has more than $2.4 billion in member accounts, each of which is federally insured for at least $250,000 by the National Credit Union Share Insurance Fund, administered by the NCUA, a United States government agency. The Credit Union has branches in the five boroughs of New York City, Long Island, and Westchester.

### Dental Reimbursement Scheme

      9. As described in greater detail below, the investigation, which is ongoing, has revealed that KAM WONG, the defendant, defrauded and embezzled from the Credit Union by requesting and receiving reimbursement for dental work that he never received and for which he did not pay. In furtherance of this scheme, WONG submitted sham invoices to the Credit Union for purported dental expenses, fraudulently obtaining more than $280,000 from the Credit Union, as well as additional money to pay his personal tax liability on his purported dental reimbursements.

      10. Based on my review of records obtained from the Credit Union, I have learned that defendant KAM WONG's Contract with the Credit Union, which is dated February 2, 2005, and was subsequently amended five times, provides that the Credit Union will provide to WONG several forms of insurance. With respect to expenses for dental care, at all relevant times, the Contract provided not only for WONG to receive dental insurance for

5

himself and his spouse (which they obtained), but also, pursuant to the Fourth Amendment to the Contract, for WONG to receive reimbursement for "all uninsured medical/dental costs." The Contract does not provide—and has never provided—that the Credit Union will pay the personal taxes that WONG owes on these dental benefits to the extent that they might be deemed taxable income.

11. Based on my interviews of current and former senior management of the Credit Union, and my review of records obtained from the Credit Union to date, including accounting files, I have learned the following:

a. Between at least August 2013 and January 2018, KAM WONG, the defendant, requested and received reimbursement from the Credit Union for approximately $440,000 in dental expenses purportedly provided by two dentists ("Dentist-1" and "Dentist-2," together, the "Dentists"), allegedly paid for by WONG, and not covered by insurance.

b. WONG arranged for the Credit Union to make these dental reimbursement payments immediately upon his request, and directed that they be paid through the issuance of handwritten checks, instead of through the normal payroll system, which would have taken additional time to process. In so doing, WONG did not explain why such speed was necessary.

c. In connection with his requests for reimbursement of alleged dental expenses, WONG submitted to the Credit Union, including by emails to the Credit Union's Chief Financial Officer ("CFO") and Chief Human Resources Officer (the "HR Officer"), invoices purporting to be from the Dentists indicating services rendered and paid for by WONG. As described below, at least two dozen of these invoices were shams.

d. In addition, when the Credit Union reimbursed WONG for his purported dental expenses, WONG directed that the Credit Union pay additional money for WONG's purported personal federal and state tax liability associated with these payments, in the amount of an additional approximately $247,000.

12. Based on my interviews of the Dentists, my review of the Dentists' records, including billing records, which each of Dentist-1 and Dentist-2 has separately provided to the Government, and my comparison of those records with records provided by the Credit Union, I have learned the following:

a. Between approximately January 2013 and January 2018, KAM WONG, the defendant, in fact paid Dentist-1 approximately $145,675 for dental services, and WONG in fact paid Dentist-2 approximately $8,595 for dental services, resulting in approximately $154,370, in total, for services rendered during this time period.

b. During this same time period, at least two dozen invoices that WONG provided to the Credit Union in connection with WONG's dental reimbursement requests were not contained in Dentist-1's and Dentist-2's complete billing records, and each of Dentist-1 and Dentist-2 has separately confirmed that these invoices (the "Sham Invoices") are not legitimate invoices from his or her practice.

c. The Sham Invoices that WONG submitted to the Credit Union closely resemble real invoices prepared for WONG by Dentist-1 and Dentist-2. The Sham Invoices list dates of services, fees for services, billing codes, and a description of services allegedly provided. The Sham Invoices for Dentist-1 also include Dentist-1's name, office address, a stamp with his or her name and address, and Dentist-1's purported signature. However, the Sham Invoices have minor differences from the legitimate invoices prepared by the Dentists and their respective staffs, including with respect to font, formatting, spacing, and/or spelling. The Sham Invoices include, for example, fake signatures, fake stamps, misspellings of certain words, and/or improper billing codes. Dentist-1 also informed me that several of the Sham Invoices that purported to be for services provided by Dentist-1 were for services rendered during a time period when Dentist-1 was in the hospital and no longer practicing dentistry, and thus could not be real.

### Additional Payments Requested and Received by WONG

13. The investigation into KAM WONG, the defendant, is ongoing, and it has revealed multiple additional instances in which WONG requested and received substantial payments from the Credit Union based on what appear to be false or misleading representations, as set forth in greater detail below. Based on my review of Credit Union records and interviews performed during the investigation, I have learned that, beginning in about 2015, those payments--purportedly relating to, most significantly, long-term disability as well as payments that WONG directed the Credit Union pay for taxes on these payments-- more than doubled WONG's annual compensation from the Credit Union.

**Long-Term Disability Insurance**

14. *First*, based on my review of Credit Union records, and my interviews of Credit Union officers and board members, I have learned that, as set forth in greater detail below, between approximately June 2015 and January 2018, KAM WONG, the defendant, requested and obtained more than $3.6 million from the Credit Union in lieu of the Credit Union providing him with supplemental long term disability ("LTD") insurance, as well as more than $3.1 million to cover WONG's personal taxes on this sum. The Contract entitled WONG to LTD insurance, to be paid for by the Credit Union, beginning in or about 2007, but WONG did not elect for the Credit Union to obtain such insurance (nor did WONG do so on behalf of the Credit Union). Instead, beginning in or about June 2015, WONG sought for the Credit Union to pay him directly, in lieu of the Credit Union obtaining such insurance (the "LTD Offset Payments"), by representing to the Credit Union officials that LTD insurance would be too costly for the Credit Union. The investigation to date has revealed the following:

  a. WONG discussed the option of LTD Offset Payments with certain officials from the Credit Union and its Board of Directors in or about June 2015. In connection with that discussion, WONG represented that LTD insurance dating back to the time he became CEO (2007) and forward to the conclusion of his contract (2023) would cost or would have cost the Credit Union roughly $1 million, and proposed that WONG instead receive one lump-sum LTD Offset Payment of $200,000. Although the Credit Union's Board of Directors did not formally approve the LTD Offset Payment arrangement or modify the Contract in this regard, at or about this time, WONG began receiving LTD Offset Payments by directing the CFO to write him handwritten checks, which the CFO did.

  b. Over time, WONG directed the issuance of far more than $200,000 in LTD Offset Payments, i.e., the figure he originally requested from Credit Union officials. Between approximately June 2015 and January 2018, WONG directed the CFO to issue LTD Offset Payments to him totaling more than $3.6 million. In seeking and obtaining these payments, over time, WONG provided the CFO, as well as the Treasurer of the Board of Directors, with numerous "models" indicating the allegedly escalating cost of insuring WONG, as a measure of what WONG

should receive in LTD Offset Payments.[1] Ultimately, these models estimated that the premiums for insuring WONG would have been $119,000 for the year 2007, and up to $364,673 for the year 2023.

15. Based on my interviews performed in the investigation and my review of Credit Union records to date, I believe the insurance premium calculations in the models that KAM WONG, the defendant, presented to Credit Union officials were substantially inflated by WONG. Among other things, I have learned the only estimate that WONG appears to have received from an insurance broker ("Broker-1") for LTD insurance indicated that such insurance would cost the Credit Union between $20,000 to $30,000 per year. I also know, based on my interview of Broker-1, that after in or about January 2018 – after I had interviewed WONG about the LTD Offset Payments – WONG contacted Broker-1 in an apparent attempt, for the first time, to obtain support for his "models" and the premium estimates that they were based upon. In response, Broker-1 told WONG that "if I'm an athlete I want you as my agent," by which Broker-1 meant that, in Broker-1's view, the models requested an amount of money not justified by the actual insurance market.

16. On or about January 18, 2018, after identifying ourselves and informing KAM WONG, the defendant, that there was an investigation into payments he had received, I and other law enforcement agents questioned WONG about, among other things, the LTD Offset Payments. WONG informed me that the LTD Offset Payments had been approved by the Board of Directors, which, as set forth herein, does not appear to have happened, at least in any formal manner. On or about January 22, 2018, approximately four days later, however, WONG attended a Credit Union Board committee meeting and requested that the committee "retroactively" recommend that the Board approve the LTD Offset Payments, which the committee did recommend. Based on my review of Credit Union records and interviews with Credit Union board

---

[1] Before submitting these models to the CFO to direct the payment of LTD Offset Payments, KAM WONG, the defendant, obtained the signature of the Treasurer on the models. Based on my participation in this investigation, I do not believe that the Treasurer was aware of the substantially inflated nature of the premium calculations set forth in the models. In addition, the models, on their face, do not purport to relate to LTD insurance, nor do they indicate that they relate to payments to WONG at all.

members and officials, I believe that in seeking and obtaining this retroactive "approval," WONG made false and misleading statements to the Board committee, including with respect to the inflated costs of LTD insurance, as discussed herein.

### Vehicle Repairs

17. *Second*, based on my review of Credit Union records and interviews performed during the investigation, I have learned that KAM WONG, the defendant, requested and received reimbursement from the Credit Union for certain damage to vehicles that the Credit Union leased for him, for which it appears WONG did not pay and thus did not need reimbursement. This included that, in or about 2011, WONG requested and received reimbursement from the Credit Union in connection with a May 20, 2011 estimate from an auto body shop ("Shop-1") for repair work of $25,333.26 on a 2011 Mercedes Benz E550 (the "2011 Mercedes"). Based on my interview of a representative of Shop-1 and my review of records received from Shop-1, I have learned that WONG did not personally pay for repair work on the vehicle, and that, instead, WONG submitted an insurance claim for the repair for damage to the 2011 Mercedes, and the insurance company paid for the repair work.

### ATM Withdrawals

18. *Third*, based on my review of Credit Union records and interviews performed in the investigation, I have learned that, between in or about July 2013 and September 2013, KAM WONG, the defendant, withdrew cash from ATMs on numerous occasions, in amounts of approximately $500 each time, using a Credit Union credit card he was issued for business expenses. WONG continued to withdraw these cash advances until he was questioned by the Credit Union accounting department about this activity, and then claimed that he was conducting "tests" of the ATMs. WONG agreed to reimburse the Credit Union for the money, totaling more than $8,000. Based on my interviews with the then-current Vice President of Finance and the then-current CFO, neither had been aware, at that time, of WONG engaging in any "testing" of the Credit Union's ATMs, or having any reason to do so as CEO.

### Payment of Expenses for a Friend's Relatives

19. *Fourth*, based on my interviews of current and former Credit Union senior management and my review of Credit Union records, I am have learned that, beginning in or about 2010 and continuing until at least on or about January 2018, KAM

10

WONG, the defendant, directed the HR Officer and the Credit Union's CFOs (both its current and former one) to have the Credit Union pay for visas, tuition, textbooks, housing, and various living expenses for two young relatives of a family friend of WONG in Hong Kong, who served initially as interns to the Credit Union. These expenses totaled more than a hundred thousand dollars, and included, most recently, a luxury downtown rental of $5,245 per month, which WONG directed the HR Officer to pay, for which the HR Officer then received reimbursement from the Credit Union.

### Cash Advances

20. *Fifth*, based on my interviews of the current and former Credit Union CFO, and my review of Credit Union records, I have learned that, from at least 2011 through 2017, KAM WONG, the defendant, annually requested and received tens of thousands of dollars of cash advances from the Credit Union under what appears to be suspicious or questionable circumstances. Specifically, I have learned that:

    a. WONG did not supply any invoices or other documentation detailing what these cash advances were spent on.

    b. In approximately 2011, after the then-current CFO ("CFO-1") questioned approximately $30,000 in cash advances, WONG told CFO-1 that WONG was too busy to provide supporting documentation, and requested a personal loan from CFO-1 in order to reimburse the Credit Union for this money. CFO-1 then provided a $30,000 personal loan to WONG (in cash), and WONG then reimbursed the Credit Union.[2]

    c. In or about November 2013, CFO-1 again questioned WONG about the lack of supporting documentation for cash advances, because the Credit Union's auditors were planning to come to the Credit Union. WONG then reimbursed the Credit Union, by an official check, approximately $24,900, for cash advances. However, even after this date, WONG continued to request tens of thousands of dollars annually for cash advances, for which he did not provide supporting documentation.

---

[2] Based on my interview of CFO-1, I have learned that WONG did not repay this loan for at least approximately two years. In approximately 2014, a few weeks after he repaid the loan, WONG asked CFO-1 to borrow $5,000 in cash, which he or she provided. WONG never repaid CFO-1 that money.

11

**Payments Relating to Sick Leave**

21. *Sixth,* based on my review of Credit Union records and interviews of current and former Credit Union senior management, I have learned that between 2009 and 2012, KAM WONG, the defendant, took cash payments in lieu of 320 sick days that he purportedly had not used, which exceeded the limits set in the Contract and Credit Union policy, which limits provided, during the relevant period, that an employee could accrue a maximum total of 70 days of unused sick leave during his or her tenure at the Credit Union.[3]

**Wong's Apparent Lottery Habit and His Use of Criminal Proceeds**

22. Based on my review of Credit Union records and interviews performed during the investigation, I have learned that KAM WONG, the defendant, spent at least approximately $3.55 million on the New York State Lottery between July 2013 and January 2018, as described further below. In addition, at the same time when WONG was defrauding and embezzling from the Credit Union, as described above, WONG also sought and borrowed money from several sources, including from CFO-1 and Broker-1, which he used, at least in part, to purchase lottery tickets.

23. Based on my review of records obtained from the Credit Union and my conversations with other law enforcement personnel, I have learned the following:

   a. Between July 2013 and January 2018, KAM WONG, the defendant, received and deposited almost $6 million of hand-written checks from the Credit Union into his account at the Credit Union. Much, but not all, of this money was proceeds of the conduct described above. From that account, WONG wrote more than approximately 278 checks, totaling approximately $3.9 million, between July 2013 and January 2018. WONG wrote approximately 52 checks, totaling approximately $272,500, to a

---

[3] In connection with obtaining payment for some of these requests for sick leave, KAM WONG, the defendant, submitted to Credit Union senior management memoranda signed by the then-current chair of the Board of Directors purportedly approving these requests. Based on my review of Credit Union records and interviews conduct in the investigation, I believe that in seeking and obtaining this approval, WONG made false and misleading statements to the chair of the Board, including with respect to the number of days of sick leave that he had accrued and to which he was entitled.

12

convenience store located a few blocks from WONG's office ("Store-1"), and approximately 131 checks, totaling approximately $3,076,000, to a convenience store in Elmont, New York ("Store-2"), located within a mile of WONG's home, as well as 33 checks, totaling approximately $200,000, to the owners of Store-2.

        b.    In addition, between July 2013 and January 2018, WONG withdrew from his Credit Union accounts more than $1.9 million via ATMs over the course of approximately 2,592 transactions, sometimes occurring multiple times a day.

        24.    Based on my interviews of the owners of Store-1 and Store-2, and my review of bank records, I have learned that the checks KAM WONG, the defendant, wrote to Store-1 and Store-2 – totaling more than $3.3 million – were primarily for the purchase of New York State Lottery tickets, and that, on the weekends, at times, KAM WONG, the defendant, spent hours at Store-2 purchasing and playing lottery tickets.

        WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of KAM WONG, the defendant, and that he be imprisoned or bailed, as the case may be.

        *[signature]*
LaVale Jackson
Special Agent
United States Attorney's Office
Southern District of New York

Sworn to before me this
7th day of May 2018

*[signature]*
THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK